IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

RAFAEL PINA, *et al.*,

    Plaintiffs,

v.

TONY FELICIANO RIVERA, *et al.*,

    Defendants.

Civil No. 11-2217 (GAG/BJM)

## REPORT AND RECOMMENDATION

Alleging a breach of contract, copyright infringement, and tortious deceit, Rafael Pina, World Management Latino Corp., and World Latin Music Corp. (collectively "Pina") sued Tony Feliciano-Rivera ("Feliciano") d/b/a/ "Tony Dize" and requested injunctive relief against him and other defendants not involved in the motion before the court. Docket No. 1. Pina and Feliciano agreed to settle, Docket No. 93, and the court dismissed the claims against Feliciano while retaining jurisdiction to enforce the settlement agreement. Docket No. 95. Pina now moves for a preliminary injunction to enjoin Feliciano's alleged violation of the settlement agreement, Docket Nos. 129, 130, 143, 150, which Feliciano opposed, Docket No. 149. This matter was referred to me for a report and recommendation. Docket No. 152.

For the following reasons, the motion should be **GRANTED.**

### BACKGROUND

On October 29, 2015, the parties stipulated before me that there is no factual dispute in this case. Docket No. 159. Feliciano admitted the factual allegations in Pina's motions, but claims he did not violate their settlement agreement. Docket No. 159. The parties also agree that the resolution of this case turns on the terms of their settlement agreement. Docket No. 159.

*The Settlement Agreement*

On January 14, 2014, Pina filed a confidential settlement agreement. Docket No. 93. Rather than just one agreement, however, the filing contains three separate contracts:[1] the first contract is titled "Confidential Settlement Agreement" ("CSA");[2] the second, "Exclusive Recording Contract";[3] and the third, "Exclusive Agreement for Management and Representation."[4] Docket No. 93. All three of these contracts are dated December 4, 2013. Docket No. 93.

The CSA incorporates five prior contracts and an addendum to one of the contracts. CSA ¶¶ 1.5–1.9, Docket No. 93. Two of these contracts transferred to Pina three prior contracts entered into between Feliciano and WY Management Team and WY Records ("WY") on November 3, 2005. CSA ¶ 1.7–1.8; Docket Nos. 29-4, 29-5, 38-2. The three prior contracts between WY and Feliciano include (1) an "Exclusive Recording Contract,"[5] (2) an "Exclusive Booking Agreement,"[6] and (3) a "Management Contract."[7] All three of these contracts have exclusivity clauses. *See* Exclusive Booking Agreement ¶¶ II (A)–(C), Docket No. 29-1 at 1; Exclusive Recording Contract ¶ I, Docket No. 29-2 at 1; Management Contract ¶¶ (A), (A)(1), Docket No. 29-3 at 1.

The subject matter of the 2005 Exclusive Recording Contract, Exclusive Booking Contract, and Management Contract is similar to the 2013 Exclusive Recording Contract and Exclusive Agreement for Management and Representation. Indeed, some of the terms

---

[1] Pina claims there is one contract with three "sections." Docket No. 165 at 3. Not so. Three separate contracts were entered into on December 4, 2013. These contracts do not refer to each other and stand alone as separate agreements. The dispute in this case largely turns on this distinction, and on each party's reliance on the different parts of the three contracts submitted in the 28-page document at Docket No. 93.

[2] The Confidential Settlement Agreement, which comprises pages 1–7 of the 28-page filing at Docket No. 93, was the only contract in English.

[3] Pina submitted a translation of the 2013 Exclusive Recording Contract, which comprises pages 8-14 of the filing at Docket No. 93. Docket No. 163-1.

[4] Feliciano submitted a translation of the Exclusive Agreement for Artistic Management and Representation, which comprises pages 15-28 of the filing at Docket No.93. Docket No. 149-1 at 1–15.

[5] Translated at Docket No. 29-1.
[6] Translated at Docket No. 29-2.
[7] Translated at Docket No. 29-3.

of the contracts entered into in 2005 deal with the same subject matter as the contracts from 2013.[8] Importantly, the CSA—which incorporates the three contracts from 2005—contains an integration clause that the two other contracts dated December 4, 2013, do not have. Specifically, Clause 2.6 of the CSA provides:

> This Agreement constitutes the entire agreement between the parties with regard to the subject matter hereof and supersedes all prior and contemporaneous agreements, understandings, and representations between the parties, oral or written, concerning such subject matter. No representation, promise, condition, inducement or statement of intention, express or implied, that is not set forth in this Agreement has been made by either party concerning such subject matter. No party has relied upon any representation, promise, condition, inducement or statement of intention, express or implied, that is not set forth in this Agreement concerning such subject matter. No party shall be bound by any purported representation, promise, condition, inducement or statement of intention, express or implied, that is not set forth in this Agreement concerning such subject matter.

CSA ¶ 2.6, Docket No. 93 at 5. In the CSA, Feliciano agreed to have a judgment of $500,000 ("the judgment") entered against him. CSA ¶ 1.1. As noted above, he also agreed that his three prior agreements with WY records that were transferred to Pina would remain in "full force and effect," except to the extent they were modified by the CSA. CSA ¶ 1.9.

The CSA extended the duration of the 2005 Exclusive Recording Agreement to last five years or until Feliciano satisfies the judgment—"whichever is later." CSA ¶ 1.10. To satisfy the judgment, the CSA requires Feliciano to deliver "master recording[s]" to Pina. CSA ¶ 1.11. For each master recording Feliciano submits to Pina in the manner specified in the CSA, his judgment is reduced by $5,000. CSA ¶ 1.11.

As to the Exclusive Booking Agreement, Feliciano similarly agreed to extend its

---

[8] For example, the CSA incorporates the 2005 Exclusive Recording Contract and provides that Feliciano will get no royalty payments. CSA ¶ 1.12; Docket No. 29-2 at 2–3. On the other hand, the 2013 Exclusive Record Contract states that Feliciano will get royalties and specifies the method by which his royalties will be calculated. Exclusive Recording Contract ¶¶ VIII (a)–(b), Docket No. 163-1at 3.

duration to the later of either five years or the satisfaction of the judgment. CSA ¶ 1.13. The CSA also increased Pina's commission from 40% to 50% of Feliciano's gross income. CSA ¶ 1.14.

Similarly, the Management Contract was extended for the same time period as the other two contracts from 2005, and Pina's commission was increased from 40% to 50% of Feliciano's gross income. CSA ¶¶ 1.15, 1.16. The CSA contains a choice-of-law provision which states that it must be construed and enforced according to Puerto Rico law. CSA ¶ 2.11.

*Alleged Violations of the CSA*[9]

Feliciano has sought royalties directly from Sound Exchange through a third party not employed by Pina. Pina discovered that Gabriel Dotel a/k/a "Mek" is representing Feliciano, offering Feliciano's services, and contracting and collecting fees on his behalf.

Feliciano has also cancelled events arranged by Pina and performed at events he independently arranged without Pina's authorization. Specifically, alleging that he was having back pain, Feliciano cancelled three performances on June 5 and 6, 2015, in California and Louisiana. Docket No. 130-3. As a result, Pina paid at least $5,000 in cancellation fees and at least $7,660 in unused plane tickets. Pina subsequently learned that Feliciano feigned his ailment and performed at various locations in Florida. Ex. 4, Docket No. 130-4.

Thereafter, Pina cancelled three more events because Feliciano claimed to be sick. These events included concerts in Massachusetts, Connecticut, and Guatemala. Docket No. 130. Pina later discovered that Feliciano did perform at these events after he directly contacted the event organizers and promoters to arrange the performances. When he did so, Feliciano renegotiated the fees and allocated the payments to himself rather than

---

[9] These facts are drawn from the factual allegations in Pina's motions, which Feliciano admitted. Docket Nos. 130, 144. Docket No. 159.

channeling the payments through Pina. As a result, in addition to losing money, Pina claims he lost credibility with his promoters and industry contacts.

Feliciano has also performed at various events without Pina's authorization: in July 2015, he performed at events in Ohio, Virginia, New York, and Florida; in August 2015, he performed at events in New York and Florida. Exs. 5–6, Docket Nos. 130-5, 130–6; Docket Nos. 144-1–144-4. Pina has told Feliciano not to breach the settlement agreement, and has kept him apprised of the motions he has filed before this court. Docket Nos. 144-5–144-9.

## DISCUSSION

Pina seeks a preliminary injunction to enjoin Feliciano's violation of the settlement agreement. Feliciano readily admitted that he has been performing at events without Pina's authorization and cancelling events. According to him, however, he has not violated the terms of the agreement the parties reached when they settled the case.

"The district court retains the power to enforce the settlement agreement provided the dismissal order expressly incorporates the settlement agreement, or expressly preserves jurisdiction over the settlement agreement." *Metro-Goldwyn Mayer, Inc. v. 007 Safety Products, Inc.*, 183 F.3d 10, 14 (1st Cir. 1999) (citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 378 (1994)). Because this court retained jurisdiction to enforce the settlement agreement upon the parties' agreement to do so, it has authority to issue an injunction despite the dismissal of Pina's claims against Feliciano. Docket No. 95; CSA ¶ 1.18.

I.   **Preliminary Injunction**

A plaintiff seeking a preliminary injunction must demonstrate "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Defense Council, Inc.*, 555 U.S. 7, 20 (2008) (Court rejected rule that when "a plaintiff demonstrates a strong likelihood of prevailing

on the merits, a preliminary injunction may be entered based only on a 'possibility' of irreparable harm").

## II.     Likelihood of Success

The precise business relationship that governs the parties, and whether Pina is likely to succeed on the merits, depends on the terms of the settlement agreement. "Contract interpretation presents, in the first instance, a question of law, and is therefore the court's responsibility." *Fashion House, Inc. v. K Mart Corp.*, 892 F.2d 1076, 1083 (1st Cir. 1989). And "[t]o the extent that the questions presented turn on the language of the settlement agreement," the court is "guided by the language of the agreement" and "the usual considerations of contract interpretation." *AccuSoft Corp. v. Palo*, 237 F.3d 31, 39–40 (1st Cir. 2001). In this case, the CSA contains a choice-of-law provision, which states that the CSA "shall be construed and enforced in accordance with the laws of the Commonwealth of Puerto Rico." CSA ¶ 2.11. Accordingly, the court should look to Puerto Rico law to interpret and enforce the CSA. *McCarthy v. Azure*, 22 F.3d 351, 356 n.5 (1st Cir. 1994) ("a reasonable choice-of-law provision in a contract generally should be respected").

As a civil law jurisdiction, Puerto Rico requires courts to consider its civil code, not common law principles, when interpreting a contract. *Borschow Hosp. & Med. Supplies, Inc. v. Cesar Castillo*, 96 F.3d 10, 15–16 (1st Cir. 1996) (citing *Guevara v. Dorsey Labs., Div. of Sandoz, Inc.*, 845 F.2d 364, 366 (1st Cir. 1988) ("The Supreme Court of Puerto Rico has made clear that the common law of the United States is not controlling when filling gaps in the civil law system.")).

Puerto Rico Civil Code "Article 1233 determines the manner in which courts should interpret contracts under dispute as to the meaning of their terms." *Hopgood v. Merrill Lynch, Pierce, Fenner & Smith*, 839 F. Supp. 98, 104 (D.P.R. 1993), *aff'd* 36 F.3d 1089 (1st Cir. 1994). Article 1233 provides, "If the terms of a contract are clear and leave no doubt as to the intentions of the contracting parties, the literal sense of its stipulations

shall be observed." P.R. Laws Ann. tit. 31, § 3471. "This article has been interpreted (along with former Rule 69(B)) to bar consideration of evidence extrinsic to a written contract where an agreement is clear and unambiguous." *IOM Corp. v. Brown-Forman Corp.*, 553 F. Supp. 2d 58, 63 (D.P.R. 2007). "Although the Puerto Rico Legislature repealed Rule 69(B) in 2004, article 1233 alone bars consideration of extrinsic evidence where an agreement leaves no doubt as to the intent of the contracting parties." *Id.*

The critical language in the CSA is its integration clause. It provides that the CSA "constitutes the entire agreement between the parties with regard to the subject matter hereof and *supersedes all prior and contemporaneous agreements*, understandings, and representations between the parties, oral or *written*, concerning such subject matter." CSA ¶ 2.6 (both emphases added). The effect of this plain language is to supersede any provision of the other two agreements entered into on December 4, 2013 (the Exclusive Recording Contract and the Exclusive Agreement for Management and Representation) that relates to "the subject matter" of the CSA. CSA ¶ 2.6. Because the plain language of the CSA is clear, extrinsic evidence is unnecessary to determine the contract that governs the business relationship between Pina and Feliciano. *See Executive Leasing Corp. v. Banco Popular de P.R.*, 48 F.3d 66, 69 (1st Cir. 1995) ("to consider the extrinsic evidence at all, the court must first find the relevant terms of the agreement unclear."); *see also Marina Ind. Inc. v. Brown Boveri Corp.*, 14 P.R. Offic. Trans. 86, 98 (1983) ("[t]he strict mandate of the cited art. 1233 obliges us to abide by the literal meaning of the terms of the contract when, as in the present case, they leave no doubt as to the intention of the contracting parties.").

Moreover, there is no ambiguity arising from the fact that there are two contracts titled "Exclusive Recording Contract"—one dated November 3, 2005, and another dated December 4, 2013—and the additional fact that the CSA refers to "the Exclusive Recording Agreement," CSA ¶ 1.10, and "the Exclusive Recording Contract," CSA ¶ 1.12. Although the CSA may appear to present a latent ambiguity at first blush, it does

not. *See Coffin v. Bowater, Inc.*, 501 F.3d 80, 98 (1st Cir. 2007) (citing "*Raffles v. Wichelhaus*, 2 Hurlstone & Coltman 906, 159 Eng. Rep. 375 (Ex. 1864), in which shipment of cotton to arrive from a certain port on the ship 'Peerless' was found ambiguous when the parties discovered that two ships named 'Peerless' had departed from the same port.").

The CSA does not suffer from a latent ambiguity because Clause 1.6 expressly states that the Exclusive Recording Contract that is incorporated into the CSA is the "agreement[]" he "executed" in November 2005.[10] CSA ¶ 1.6. Clause 1.6 similarly expressly states that the other two agreements—the Exclusive Booking Agreement and the Management Contract—that are incorporated into the CSA were executed in November 2005, not 2013. Thus, the plain language of the CSA supersedes any terms in the two other contracts entered into on December 4, 2013, to the extent they deal with the same subject matter.

Having detailed the contracts that govern the parties' relationship, I consider for the moment the parties' conflicting interpretations of the settlement agreement. Feliciano claims the settlement agreement ends once Pina collects the $500,000 judgment. Taking this interpretation, Feliciano asks that Pina specify how much of the $500,000 judgment has been satisfied to determine whether the settlement agreement still controls their business relationship. On the other hand, Pina claims the settlement contract ends either in five years or when Feliciano delivers $500,000—whichever is later. Pina essentially claims an injunction is proper because the settlement contract lasts at least five years after December 4, 2013. At this juncture, Pina has not told Feliciano how much of the judgment has been satisfied, and the court did not hear testimony or receive evidence relating to this issue. Docket No. 159.

---

[10] I note that the 2005 Exclusive Recording Contract was entered into on November 3, 2005—not November 5, 2005, as stated in the CSA.

Based upon the court's own reading of the contracts, Feliciano agreed in the CSA to extend the Exclusive Recording Contract, the Exclusive Booking Agreement, and the Management Contract for a term of either five years or until the satisfaction of the $500,000 judgment—whichever is later. CSA ¶¶ 1.10, 1.13, 1.15. This "whichever is later" language in the CSA is critical and means that Feliciano is at the very least bound by the agreements incorporated in the CSA until 2018. Thus, while it will be necessary for Pina ultimately to provide Feliciano with accounting records to determine how much of the judgment has been satisfied,[11] it is unnecessary to determine that amount to resolve the current preliminary injunction motion.

To be sure, Feliciano's interpretation of the settlement agreement's duration is supported only by the 2013 Exclusive Recording Contract. Docket No. 163-1. Clause IV of that contract states that the term of that contract lasts "5 years" or until the "$500,000. debt is recovered." Docket No. 163-1 at 2. Unlike the CSA, this contract does not have the qualifying language stating that the contract lasts until the "later" of the two conditions. Had this contract controlled the business relationship between the parties, then it would have been necessary at this juncture to consider evidence relating to the amount of the judgment that has been satisfied. However, as explained above, the CSA supersedes the 2013 Exclusive Recording Contract and so Feliciano's claim that the settlement agreement may have ceased to exist by its own terms is inaccurate. Because the crux of the parties' dispute was the duration of the settlement agreement, and because the CSA lasts at least five years, Pina is likely to succeed on the merits.

## III.   Irreparable Harm

A party moving for a preliminary injunction must demonstrate that he or she is "likely" to suffer irreparable harm. *Winter*, 555 U.S. at 20. "Injunctions against breach of contract are common where there is some reasonable doubt about whether damages can

---

[11] The court has already ordered Pina to provide Feliciano with these accounting records. Docket No. 159.

be sufficient." *Almond v. Capitol Props., Inc.*, 212 F.3d 20, 25 (1st Cir. 2000). And "because injuries to goodwill and reputation are not easily quantifiable, courts find this type of harm irreparable." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 217 F.3d 8, 13–14 (1st Cir. 2000) (court affirmed district court's grant of injunctive relief to enforce terms of settlement agreement). For a similar reason, the Puerto Rico Supreme Court has held that when a trial court considers whether to grant a preliminary injunction, it must consider that if an artist "can freely do business with other promoters notwithstanding [his] exclusive contract [with a promoter], [then the promoter's] credibility and goodwill will be seriously affected in the entertainment industry, harming not only the [artist] but other lucrative business opportunities with other artists." *See Garcia v. World Wide Entm't*, 132 D.P.R. 378, 390 (P.R. 1992).

Feliciano has admitted that he has failed to attend events scheduled by Pina. When he missed some of these events, he feigned sickness and performed at other events he independently arranged without Pina's authorization. These cancelled events have resulted in some damages that are easily quantifiable. For example, Pina alleges that as a result of three cancelled events, he paid at least $5,000 in cancellation fees and at least $7,660 in unused plane tickets. But he also claims that his "credibility" has been hurt when Feliciano cancels events, renegotiates fees, and independently arranges his own performances. Because his goodwill with promoters and event organizers is likely damaged when Feliciano engages in such conduct, Pina is suffering damages that are not easily quantifiable. *See Ross-Simons*, 217 F.3d at 13–14; *Garcia*, 132 D.P.R. at 390. Accordingly, Pina has demonstrated that he is likely to suffer irreparable harm if the injunction does not issue.

**IV. Balance of Hardships**

The court must balance "the hardship that will befall the nonmovant if the injunction issues . . . with the hardship that will befall the movant if the injunction does not issue." *Mercado-Salinas v. Bart Enterprises Intern., Ltd.*, 671 F.3d 12, 19 (1st Cir.

2011). As an initial matter, Pina entered into a settlement agreement with Feliciano to stop precisely the conduct in which he is now engaging. If the injunction does not issue, then Pina will be deprived of benefitting from the settlement agreement the parties reached. Moreover, if the injunction does not issue, Feliciano may continue to damage Pina's goodwill with event promoters and event organizers. Pina has already paid thousands of dollars as a result of Feliciano's cancelled events. He has also lost the proceeds that should be going to him instead of Feliciano's new representative, Mek.

On the other hand, if the injunction issues, Feliciano will suffer hardship by not being able to contract for his musical endeavors with parties other than Pina. If Feliciano is later successful in this case, then he will potentially have lost new business opportunities. Feliciano will also not be able to collect royalties if the injunction issues. On balance, I find that the balance of hardships tips in Pina's favor because Feliciano will still be able to continue the business relationship he agreed to have with Pina. Denying the injunction, on the other hand, deprives Pina of benefitting from the settlement agreement and may prevent Feliciano from ceasing to contract with third parties for his musical endeavors.

**V.     Public Interest**

"The public interest that is referred to in the test for a preliminary injunction [is] the public interest in the issuance of *the injunction itself*." *Braintree Labs., Inc. v. Citigroup Global Markets, Inc.*, 622 F.3d 36, 45 n.8 (1st Cir. 2010). Issuing an injunction in this case likely benefits the public interest because the law "encourages settlements between the litigating parties to avoid unnecessarily lengthy and costly litigation." *Ramallo Bros. Printing, Inc. v. Federal Exp. Corp.*, 129 D.P.R. 499, 513 (P.R. 1991); *see also United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 84 (1st Cir. 1990) ("it is the policy of the law to encourage settlements") *Mathewson Corp. v. Allied Marine Indus., Inc.*, 827 F.2d 850, 852 (1st Cir. 1987) ("As any litigator or judge can attest, the best case is a settled case."). By enforcing the parties' settlement agreement, other litigants who

have entered into such agreements will not be tempted to disaffirm their contractual obligations.

Moreover, issuing an injunction which enforces a settlement agreement that incorporates exclusive contracts also furthers the public interest. The Puerto Rico Supreme Court found "important" to the "public interest" that "local and foreign promoters will not want to risk having exclusive contracts with other talent-ed [sic] youths in the fear that these exclusive contracts are not binding," which might "hinder the possible development of Puerto Rico youths in show business, and would harm the local entertainment industry in general." *Garcia*, 132 D.P.R. at 380. Thus, the public interest favors the issuance of an injunction in this case. Because the four factors point to the conclusion that Pina is entitled to injunctive relief, the court should issue a preliminary injunction.

## VI. Scope of the Injunction

Even when a party is entitled to injunctive relief, the injunction order may not be overly broad and "must be tailored to the specific harm to be prevented." *Ross-Simons*, 217 F.3d at 14 (court affirmed permanent injunction where district court found that [defendant] violated the [settlement agreement] in two ways . . . . [and] order[ed] specific performance in precisely the same terms [as the settlement agreement]"). Moreover, an injunction should be limited to "restricting improper conduct of the type which the . . . record indicates [the party sought to be enjoined] has displayed in the past." *Cok v. Family Court*, 985 F.2d 32, 36 (1st Cir. 1993). Pina requests that the court enjoin Feliciano and his "officers, servants, employees, attorneys, successors and assigns, and any person acting in concert or participation with any of them" from:

> [1] Breaching the Confidential Settlement Agreement, Exclusive Recording Agreement, Exclusive Booking Agreement and Management Contract executed by and between Plaintiffs and Defendants.
> [2] Entering or executing agreements or contracts regarding the scheduling of appearances by Defendant and/or negotiating the terms of a musical, promotional and/or marketing performances by Defendant, including but

not limited to, any commitment that may require the physical presence of Defendant.
[3] Collecting royalties, moneys, payments, funds, loans, payment for services in kind or deriving pecuniary gain through any method of commercial exploitation or compensation scheme that has ever existed or will ever exist on behalf of Defendant to the exclusion of Plaintiffs.
[4] Making the false representation that anyone other than Plaintiff can negotiate on behalf of Defendant, or manage his musical career, and from unlawfully making such representations.
[5] Failing to honor professional commitments scheduled by Plaintiff for Defendant, or interfering with such commitments by engaging promoters, producers or sponsors directly without the knowledge or consent of Plaintiffs.
[6] Entering contracts or agreements to record Defendant for commercial purposes, including video or audio recordings.
[7] Entering contracts or agreements to commercially exploit the image or talents of Defendant, including, but not limited to, merchandising; print, radio, TV or internet promotions or engagements.
[8] Producing, distributing and/or commercially employing materials with the music, videos, and/or image and likeness of Defendant for the purposes of pecuniary gain.
[9] Deriving profits, revenue, income or any form of gain from the music, videos or image of Defendant to the detriment of Plaintiffs and in breach of the Confidential Settlement Agreement, Exclusive Recording Agreement, Exclusive Booking Agreement and Management Contract executed by and between Plaintiffs and Defendants.
[10] Inducing, contributing, aiding or abetting Defendant in any actions or omissions that might constitute a breach of the agreements between Plaintiffs and Defendants.

Docket No. 129. at 2–3. I consider in turn each of Pina's requests to determine whether the CSA and the factual allegations, which Feliciano admitted, warrant the precise injunctive relief Pina requests.

Pina first asks that the court enjoin Feliciano from breaching the CSA and the three contracts from 2005 incorporated therein. This request is proper. *See Ross-Simons*, 217 F.3d at 14 (court upheld injunction order that "mirrored the operative language of the [settlement agreement]").

Second, Pina seeks to stop Feliciano from independently entering contracts to appear at musical events and negotiating the terms of musical, promotional, or marketing performances. Feliciano readily admitted that he has been performing at events without

Pina's authorization and that he renegotiated the fees at some events. The 2005 Exclusive Booking Agreement incorporated into the CSA designates Pina as the "entity and/or person with exclusivity" to coordinate "(shows/concerts), aka booking." Exclusive Booking Agreement ¶ II.A, Docket No. 29-1. The Puerto Rico Supreme Court has held that exclusive agreements of this type are valid and that injunctive relief is appropriate to enforce such contracts. *Garcia*, 132 D.P.R. at 389.

Third, Pina seeks to stop Feliciano from collecting any "royalties, moneys, payments, funds, loans, payment for services in kind or deriving pecuniary gain through any method of commercial exploitation or compensation scheme . . . [that excludes Pina]." Feliciano admitted that he has attempted to collect royalty payments directly from Sound Exchange through his representative, Mek. Feliciano also admitted that he has collected payments for events and not shared those payments with Pina.

In the CSA, Feliciano agrees that he "foregoes and renounces all past and future artistic and mechanical royalty payments due," including, among other examples, royalties from "Sound Exchange." CSA ¶ 1.12. Recognizing that the 2005 Exclusive Recording Contract contains conflicting terms as to the payment of royalties, the CSA "eliminate[d] sections VII and VIII of the Exclusive Recording Contract." CSA ¶ 1.12. However, as to Pina's third request, there were no factual allegations in Pina's motion that Feliciano derived profit from a "loan," and so there is no basis to enjoin that conduct.

Fourth, Pina seeks to stop Feliciano from representing that anyone besides Pina can manage his musical career. Feliciano admitted that he is currently being represented by Mek. Such representation violates the CSA because the 2005 Management Contract states that Feliciano "designates [Pina] as his exclusive representative in the entire universe for all matters related to his musical career." Management Contract ¶ III.A, Docket 29-3 at 2.

The fifth request seeks to stop Feliciano from directly engaging promoters, producers or sponsors without the knowledge or consent of Pina. This part of the fifth

request is essentially the same as the second request, and so Feliciano may be enjoined from engaging in such conduct.

However, the other part of Pina's fifth request is more troubling. Pina asks the court to enjoin Feliciano from "[f]ailing to honor professional commitments scheduled by [Pina] for [Feliciano]." Stated another way, Pina asks the court to order Feliciano to perform at the events Pina schedules for him. It is well settled that courts may not order specific performance of contracts that involve personal services. *See Karrick v. Hannaman*, 168 U.S. 328, 336 (1897) ("court of equity cannot compel the performance of the service, although it may in some cases enforce a negative stipulation not to serve any third person within the time agreed"). The Puerto Rico Supreme Court similarly stated within the context of exclusive contracts that "while it is not possible to compel a person to do work under a personal service contract, it is possible to bar said person from rendering his services elsewhere during the duration of the contract." *Garcia*, 132 D.P.R. at 386. The proper remedy if Feliciano refuses to honor his contractual obligation to perform at scheduled events is "an action for damages." *See id.*

As to Pina's sixth, seventh, eighth, and ninth requests, Pina did not present any factual allegations which indicate that Feliciano has previously engaged in the conduct stated in those requests. Accordingly, an injunction to stop Feliciano from engaging in that conduct is premature and improper at this juncture. *See Cok*, 985 F.2d at 36. However, to the extent that conduct violates the CSA and the agreements incorporated therein, Feliciano is still bound by those contracts.

Finally, in his tenth request, Pina asks the court to enjoin Feliciano and his "officers, servants, employees, attorneys, successors and assigns, and any person acting in concert or participation with any of them" from "[i]nducing, contributing, aiding or abetting [Feliciano] *in any actions or omissions that might* constitute a breach of the agreements between [Pina] and [Feliciano]." (emphasis added). Because engaging "in any actions or omissions that might" breach the contractual obligations between Feliciano

and Pina is overbroad and vague, the precise injunctive relief Pina requested is improper. *See, e.g.*, *International Longshoremen's Ass'n, Local 1291 v. Philadelphia Marine Trade Ass'n*, 389 U.S. 64, 76 (1967) ("The judicial contempt power is a potent weapon. When it is founded upon a decree too vague to be understood, it can be a deadly one. Congress responded to that danger by requiring that a federal court frame its orders so that those who must obey them will know what the court intends to require and what it means to forbid.").

I also note that Pina alleged that Gabriel Dotel a/ka/ Mek has been representing Feliciano. An injunction may not issue against him, however, because he was not joined as a party in Pina's preliminary injunction motion. *Additive Controls & Measurement Sys., Inc. v. Flowdata, Inc.*, 96 F.3d 1390, 1394 (Fed. Cir. 1996) ("courts of equity have long observed the general rule that a court may not enter an injunction against a person who has not been made a party to the case before it"). However, because an injunction should issue against Feliciano, the court should also enjoin his "officers, servants, employees, attorneys, successors and assigns, and any person acting in concert or participation with" him from "aiding and abetting" his violation of the injunction order. *Id.* at 1395 ("holding a nonparty in contempt for aiding and abetting in the violation of an injunction that has been entered against a party . . . is permitted").

In sum, the court should issue a preliminary injunction order, the recommended language of which is detailed below. *See, e.g.*, *Gunn v. Univ. Comm. to End War in Vietnam*, 399 U.S. 383, 386, 390 (1970) (no enforceable injunction where district court concluded by stating that the plaintiffs are "entitled . . . to injunctive relief" without issuing any order "granting or denying" an injunction).

## CONCLUSION

For the foregoing reasons, Pina's preliminary injunction motion should be **GRANTED**. I recommend that the court enter the following preliminary injunction order:

Tony Feliciano Rivera d/b/a "Tony Dize" and his officers, servants, employees, attorneys, successors and assigns, and any person acting in concert or participation with him are hereby enjoined from:

1. Violating the terms of the December 4, 2013 Confidential Settlement Agreement, which comprises pages 1–7 of the document submitted at Docket No. 93. This Confidential Settlement Agreement incorporates and modifies three prior agreements executed on November 3, 2005: (1) the Exclusive Recording Contract, Docket No. 29-1; (2) the Exclusive Booking Agreement, Docket No. 29-2; and (3) the Management Contract, Docket No. 29-3.

2. Entering agreements or contracts regarding the scheduling of appearances by Feliciano of a musical, promotional, or marketing event.

3. Negotiating the terms of a musical, promotional, or marketing event by Feliciano.

4. Collecting artistic and mechanical royalty payments, including but not limited to, royalties from Sound Exchange.

5. Collecting money, payments, or funds for musical services, promotional events, or marketing performances independent of Feliciano's settlement agreement with Pina.

6. Representing that in transactions that involve Feliciano's musical career, anyone other than Pina can represent, manage, or negotiate on Feliciano's behalf.

7. Interfering with Feliciano's events that Pina schedules by directly engaging promoters, producers, or sponsors without the knowledge or consent of Pina.

8. Aiding or abetting the violation of this injunction order.

Pina et al. v. Feliciano Rivera et al., Civil No. 11-2217 (GAG/BJM)                                                                                    18

This report and recommendation is filed pursuant to 28 U.S.C. 636(b)(1) and Rule 72(d) of the Local Rules of this Court. Any objections to the same must be specific and must be filed with the Clerk of Court **within fourteen days** of its receipt. Failure to file timely and specific objections to the report and recommendation is a waiver of the right to appellate review. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Davet v. Maccorone*, 973 F.2d 22, 30–31 (1st Cir. 1992); *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985, 991 (1st Cir. 1988); *Borden v. Sec'y of Health & Human Servs.*, 836 F.2d 4, 6 (1st Cir. 1987).

**IT IS SO RECOMMENDED.**
In San Juan, Puerto Rico, this 18th day of December 2015.

*S/Bruce J. McGiverin*
BRUCE J. McGIVERIN
United States Magistrate Judge