# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **RAFAEL PINA**, *et al.*, <br><br>    Plaintiffs, <br><br> v. <br><br> **TONY FELICIANO RIVERA**, *et al.*, <br><br>    Defendants. | Civil No. 11-2217 (GAG/BJM) |

## REPORT AND RECOMMENDATION

Alleging a breach of contract, copyright infringement, and tortious deceit, Rafael Pina, World Management Latino Corp., and World Latin Music Corp. (collectively, "Pina") sued Tony Feliciano-Rivera ("Feliciano") d/b/a "Tony Dize" and requested injunctive relief against him and other defendants not involved in the motion before the court. Docket No. 1. Pina and Feliciano reached a settlement agreement, Docket No. 93, and the court dismissed the claims against Feliciano while retaining jurisdiction to enforce the parties' settlement agreement. Docket No. 95. Pina previously moved for a preliminary injunction, Docket Nos. 129, 130, 143, 150, and the court granted preliminary injunctive relief. Docket No. 185. This court ordered Feliciano to show cause for not converting the preliminary injunction into a permanent injunction. Docket No. 186. Feliciano responded to the court's order and moved to set aside the preliminary injunction. Docket No. 189. Pina opposed and moved for a permanent injunction. Docket No. 216. This matter was referred to me for a report and recommendation. Docket No. 202.

For the reasons set forth below, the court should **DENY** Feliciano's motion to set aside the preliminary injunction, and should **GRANT** permanent injunctive relief.

## BACKGROUND

On January 14, 2014, Pina filed a confidential settlement agreement. Docket No. 93. This filing contains three separate contracts: the first contract is titled "Confidential

Pina, *et al.* v. Feliciano Rivera, *et al.*, Civil No. 11-2217 (GAG/BJM)                                    2

Settlement Agreement" ("CSA");[1] the second, "Exclusive Recording Contract";[2] and the third, "Exclusive Agreement for Management and Representation."[3] Docket No. 93. All three of these contracts are dated December 4, 2013. Docket No. 93.

The CSA incorporates five prior contracts and an addendum to one of the contracts. CSA ¶¶ 1.5–1.9, Docket No. 93. Two of these contracts transferred to Pina three prior contracts entered into between Feliciano and WY Management Team and WY Records ("WY") on November 3, 2005. CSA ¶ 1.7–1.8; Docket Nos. 29-4, 29-5, 38-2. The three prior contracts between WY and Feliciano include (1) an "Exclusive Recording Contract," (2) an "Exclusive Booking Agreement," and (3) a "Management Contract." Docket Nos. 29-1–29-3. All three of these contracts have exclusivity clauses. *See* Exclusive Booking Agreement ¶¶ II (A)–(C), Docket No. 29-1 at 1; Exclusive Recording Contract ¶ I, Docket No. 29-2 at 1; Management Contract ¶¶ (A), (A)(1), Docket No. 29-3 at 1.

The subject matter of the 2005 Exclusive Recording Contract, Exclusive Booking Contract, and Management Contract is similar to the 2013 Exclusive Recording Contract and Exclusive Agreement for Management and Representation. Indeed, some of the terms in the contracts executed in 2005 deal with the same subject matter as the December 4, 2013 contracts.[4] But importantly, the CSA—which incorporates the three contracts from 2005—contains an integration clause that the two other contracts dated December 4, 2013, do not have. Specifically, Clause 2.6 of the CSA provides as follows:

---

[1] The Confidential Settlement Agreement, which comprises pages 1–7 of the 28-page filing at Docket No. 93, was the only contract in English.

[2] Pina submitted a translation of the 2013 Exclusive Recording Contract, which comprises pages 8-14 of the filing at Docket No. 93. Docket No. 163-1.

[3] Feliciano submitted a translation of the Exclusive Agreement for Artistic Management and Representation, which comprises pages 15-28 of the filing at Docket No.93. Docket No. 149-1 at 1–15.

[4] For example, the CSA incorporates the 2005 Exclusive Recording Contract and provides that Feliciano will get no royalty payments. CSA ¶ 1.12; Docket No. 29-2 at 2–3. On the other hand, the 2013 Exclusive Record Contract states that Feliciano will get royalties and specifies the method by which his royalties will be calculated. Exclusive Recording Contract ¶¶ VIII (a)–(b), Docket No. 163-1at 3.

> This Agreement constitutes the entire agreement between the parties with regard to the subject matter hereof and supersedes all prior and contemporaneous agreements, understandings, and representations between the parties, oral or written, concerning such subject matter. No representation, promise, condition, inducement or statement of intention, express or implied, that is not set forth in this Agreement has been made by either party concerning such subject matter. No party has relied upon any representation, promise, condition, inducement or statement of intention, express or implied, that is not set forth in this Agreement concerning such subject matter. No party shall be bound by any purported representation, promise, condition, inducement or statement of intention, express or implied, that is not set forth in this Agreement concerning such subject matter.

CSA ¶ 2.6, Docket No. 93 at 5. In the CSA, Feliciano agreed to have a judgment of $500,000 ("the judgment") entered against him. CSA ¶ 1.1. To satisfy the judgment, the CSA requires Feliciano to deliver "master recording[s]" to Pina. CSA ¶¶ 1.4, 1.11. For each master recording Feliciano submits to Pina in the manner specified by the CSA, the judgment is reduced by $5,000. CSA ¶ 1.11.

As noted above, Feliciano also agreed that his three prior agreements with WY Records—which were transferred to Pina—would remain in "full force and effect," except to the extent they were modified by the CSA. CSA ¶ 1.9. And the parties agreed that a "permanent injunction" would be entered to prohibit Feliciano from infringement of the "Exclusive Recording Agreement, Exclusive Booking Agreement, and Management Contract as hereby amended" by the settlement agreement. CSA ¶ 1.3.

The CSA made several modifications to the Exclusive Recording Agreement, the Exclusive Booking Agreement, and the Management Contract. The CSA extended the duration of the 2005 Exclusive Recording Agreement as follows: the "Parties hereby extend the Exclusive Recording Agreement to a period of 5 years; each year consisting to the delivery of a minimum of 12 master recordings, or till [Pina] recoups the full amount of Judgment as set forth in paragraph 1.1, whichever is longer." CSA ¶ 1.10. Feliciano similarly agreed to extend the duration of the Exclusive Booking Agreement to the later of either five years or the satisfaction of the judgment. *See* CSA ¶ 1.13. The CSA additionally

increased Pina's commission under the Exclusive Booking Agreement from 40% to 50% of Feliciano's gross income. CSA ¶ 1.14. The Management Contract was also extended for the same time period as the other two contracts from 2005, and Pina's commission under this contract was increased from 40% to 50% of Feliciano's gross income. CSA ¶¶ 1.15, 1.16. The CSA contains a choice-of-law provision, which requires that the parties' settlement agreement be construed and enforced according to Puerto Rico law. CSA ¶ 2.11.

On October 29, 2015, the parties stipulated that there was no factual dispute. Docket No. 159. Feliciano admitted the factual allegations in Pina's motions, but claimed he did not violate the parties' settlement agreement. Docket No. 159. After the preliminary injunction hearing and the issuance of a report and recommendation, this court issued a preliminary injunction and ordered Feliciano to show cause for not awarding permanent injunctive relief. Docket Nos. 176, 185, 186. In response, Feliciano moved to set aside the preliminary injunction by raising various arguments that ultimately seek to challenge the court's reading of the CSA. Docket No. 189. Pina replied to Feliciano's motion to set aside, moved for a permanent injunction, and underscored that Feliciano has engaged in conduct that violates the preliminary injunction. Docket No. 216.

## DISCUSSION

In seeking to set aside the preliminary injunction, Feliciano primarily contends that the court "incorrectly treated the CSA as a professional services contract and not as" the parties' "intention to settle the ongoing litigation by satisfying the $500,000 judgment." Docket No. 189 at 2. He also contends that the court erroneously determined that the CSA lasts at least five years, that the CSA no longer binds him because he has fully satisfied the $500,000 judgment, and that the conduct in which he is engaging—and which was prohibited by the preliminary injunction order—does not violate the terms of the CSA. *Id.* at 16. Pina responds that Feliciano misreads the unambiguous terms expressed in the CSA, and that permanent injunctive relief is warranted. Docket No. 216.

**I.      Motion to Set Aside Injunction**

Federal Rule of Civil Procedure 60(b)(5) permits the court to "modify [an] injunction" upon the defendant's showing "that 'it is no longer equitable that the judgment should have prospective application,' and that there has been the kind of 'significant change' in circumstances that the Rule requires." *See Dr. Jose S. Belaval, Inc. v. Perez-Perdomo*, 465 F.3d 33, 38 (1st Cir. 2006); *Concilio de Salud Integral de Loiza, Inc. v. Perez-Perdomo*, 551 F.3d 10, 15–16 (1st Cir. 2008); Fed. R. Civ. P. 60(b)(5). And, so long as the district court "adheres to certain standards," the court also has the discretion to dissolve an injunction. *See Sprint Commc'ns Co. L.P. v. CAT Commc'ns Int'l, Inc.*, 335 F.3d 235, 242 (3d Cir. 2003); *Glasco v. Hills*, 558 F.2d 179, 180 (3d Cir. 1977) ("the law has entrusted the power to grant or dissolve an injunction to the discretion of the trial court in the first instance").

In this case, Feliciano underscores that the CSA is a settlement agreement, and suggests that such an agreement, which is known as a "compromise" under Puerto Rico law, may not create a "new business contract" between the parties. Docket No. 189 at 16. He adds that because the CSA states that a $500,000 judgment would be entered against him, the CSA "no longer exists" once "the debt or total amount of the" judgment is paid. Puerto Rico law does not support Feliciano's theory. Under Puerto Rico law, a *compromise* "is a contract by which each of the parties in interest, by giving, promising, or retaining something, avoids the provocation of a suit, or terminates one that has already been instituted." P.R. Laws Ann. tit. 31 § 4821. In *Garcia v. The Commonwealth Insurance Co.*, 118 D.P.R. 380, No. CE-85-616, 1987 WL 448347 (P.R. Mar. 5, 1987), the Puerto Rico Supreme Court explained that "a settlement is an agreement to avoid or end a suit," and that a "settlement <u>fixes</u> a subjectively uncertain legal relationship consisting of a conflict of intentions." And yet, because the parties may agree to "willfully eliminate, <u>substitute or modify</u>—not only fix—the previous uncertain situation" that was the subject of the litigation, the Puerto Rico Supreme Court has held that a settlement agreement may create "new rights" and new obligations. *See Garcia*, 1987 WL 448347 ("The settlement gave rise

to a <u>new</u> obligation whereby Abarca would satisfy to Wallace some promissory notes on their due date.") (emphasis in original).

In this case, Feliciano and Pina agreed to settle a copyright dispute. As in *Garcia*, the settlement agreement between the parties—the CSA—did not just end the litigation between the parties; rather, the CSA created new rights and obligations. *See Garcia*, 1987 WL 448347. Specifically, the parties agreed that Feliciano's three prior agreements with WY Records—which were transferred to Pina—would remain in "full force and effect," and that such agreements were modified by the CSA. *See* CSA ¶¶ 1.3, 1.9–1.16. Each of the three contracts was extended for a "period of 5 years" or until Pina "recoups the full amount of Judgment as set forth in in paragraph 1.1 [of the CSA], whichever is longer." *See* CSA ¶¶ 1.10, 1.13, 1.15. Feliciano's reading of the CSA would render meaningless the foregoing contractual provisions, as, in his view, the CSA only obliged him to pay $500,000 in the manner of his choosing. The court should reject Feliciano's reading of the CSA, for it contravenes the unambiguous language of the CSA. *See* P.R. Laws Ann. tit. 31, § 3471("If the terms of a contract are clear and leave no doubt as to the intentions of the contracting parties, the literal sense of its stipulations shall be observed.").

Feliciano further posits that injunctive relief may not be awarded because Paragraph 1.5 of the CSA provides the only remedy to enforce a violation of the parties' settlement agreement. Docket No. 189 at 13. Paragraph 1.5 of the CSA provides as follows: Feliciano "agrees that upon failure to satisfy [the] Judgment," Pina is "entitled to the immediate execution of [the] Judgment for any amount not yet satisfied including costs and interests." CSA ¶ 1.5. The court should reject this argument, for the CSA also provides that a "permanent injunction" would be entered to prohibit Feliciano from infringement of the "Exclusive Recording Agreement, Exclusive Booking Agreement, and Management Contract as . . . amended" by the settlement agreement. CSA ¶ 1.3.

Feliciano next suggests that he has satisfied the $500,000 judgment in the manner called for by the CSA. Docket No. 189 at 9 ¶ 10. The CSA provides that each of Feliciano's

three prior agreements with WY records would remain in effect for the later of a "period of 5 years" or "or till [Pina] recoups the full amount of Judgment as set forth in paragraph 1.1, whichever is longer." Feliciano's argument lacks merit for two reasons. The first reason is that the CSA's "whichever is longer" language unambiguously requires the CSA and the agreements incorporated therein to last for at least five years. Because five years have not elapsed since Feliciano executed the settlement agreement, he is still bound by the CSA and the agreements incorporated by reference therein.

The other reason is that Feliciano has not proffered evidence demonstrating that he has satisfied the $500,000 judgment in the manner specified by the CSA. The CSA expressly states that Feliciano "shall satisfy [the] Judgment of the $500,000 *by delivering master recordings as set forth in paragraph 1.11*." CSA ¶ 1.4 (emphasis added). Paragraph 1.11 of the CSA provides that upon "delivery of each master recording," Feliciano "shall be credited with $5,000 towards the Judgment per paragraph 1.1." CSA ¶ 1.11. Nowhere in his motion does Feliciano state that he delivered 100 master recordings to Pina—the number of master recordings that would be required to satisfy the $500,000 judgment in the manner expressly called for by the terms of the CSA. Instead, Feliciano readily acknowledges that he has only "delivered 30" master recordings "for the amount of $150,000."[5] Docket No. 189 at 9 ¶ 10. Yet, Feliciano highlights monies Pina received from events, concerts, and royalties, and claims that Pina "has to apply" these funds "as payment to the $500,000 Judgment." *Id.* But the problem with Feliciano's argument is that it would render meaningless the language in Paragraphs 1.4 and 1.11—both of which specifically delineate the manner in which the $500,000 judgment must be satisfied.

Feliciano next claims that the Exclusive Booking Agreement, which was incorporated into the CSA, does not prohibit *him* (as opposed to a third party) from booking

---

[5] Pina claims that Feliciano has delivered only 17 master recordings. Docket No. 216 at 11. The dispute need not be resolved at this juncture because it is uncontested that Feliciano has not delivered 100 master recordings—the number of master recordings that would be necessary to trigger Paragraphs 1.1, 1.4, 1.10, and 1.11 of the CSA.

live performances. Docket No. 189 at 11. But the Exclusive Booking Agreement expressly includes a broad exclusivity clause. Paragraph II.A of this agreement states, "During the term of this contract, the 'Artist' designates the 'Company' as the entity and/or person *with exclusivity* to render the artistic and musical presentation coordination and orientation agency services (shows/concerts), aka booking, and in the booking of the 'Artist' in the universe. Therefore, *no other entity and/or person* may provide to the 'Artist' the services described in clause #1 of this agreement or ones that are similar to the same." Docket No. 29-1 at 1–2 (emphases added). Because this broad exclusivity clause prohibits *any* person or entity other than Pina from booking the artist's shows or concerts, Feliciano, like third parties, is prohibited from booking shows or concerts without Pina.

Other clauses in the Exclusive Booking Agreement do not contravene the broad exclusivity clause stated in Paragraph II.A. For example, Paragraph V states that "the 'Artist' designates the 'Company' . . . to sign any contract for services on behalf of the 'Artist' for any of the above-referenced activities involving the performance and/or talent of an 'Artist' as custom and usage in the industry." Docket No. 29-1 at 2–3. And Feliciano agreed to "notify to the 'Company' of any agreement with third parties so that the 'Company' may perform collection activities on behalf of the 'Artist.'" *Id.* While Feliciano claims this paragraph of the Exclusive Booking Agreement allows him to enter into contracts with third parties, he fails to explain why such conduct would not violate Paragraph II.A of the same contract. More importantly, when read in context, Paragraph V merely states that if Feliciano has any contracts with third parties—such as, for example, a preexisting contract—he should notify Pina so that the latter may "perform collection actions" on his behalf.

The thrust of Paragraphs II.A and V is not contravened by Paragraph VII of the Exclusive Booking Agreement. Paragraph VII states that Feliciano "will cooperate with the 'Company' to the best of his ability in the best interest of the career and promotion of the 'Artist.'" *Id.* at 4. And if for some reason Feliciano "receives any gross income, the

'Artist' must keep the accounting related to said gross income, including any document or written record of the transaction carried out by the 'Artist' to generate the gross income." Such records, the Exclusive Booking Agreement states, "may be inspected by the 'Company' and/or its Certified Public Accountant." *Id.* While Feliciano claims this paragraph makes it clear that he may book his own events, he fails to explain why such conduct would not contravene Paragraph II.A. And more importantly, when read in context, the nub of Paragraph VII is that Pina may inspect records of gross income received by Feliciano to ensure that the company is receiving the funds to which it is entitled under the Exclusive Booking Agreement.

Feliciano raises various other arguments that lack merit. First, he cites Clause IV of the December 4, 2013 Exclusive Recording Contract—a contract that, as previously explained, was not expressly incorporated into the CSA. Docket No. 189 at 19. This contract does not govern the parties' relationship because of the integration clause expressly included in Paragraph 2.6 of the CSA. *See* CSA ¶ 2.6. And, even though the CSA expressly states that any other agreements between the parties would be superseded by the terms of the CSA, Feliciano conclusorily argues that he was unaware of which contract would govern the parties' business relationship and that he believes that the December 4, 2013 contract binds the parties. *See, e.g.*, *Unisys Puerto Rico, Inc. v. Ramallo Bros. Printing*, 128 D.P.R. 842, No. CE-89-754, 1991 WL 735351 (P.R. June 28, 1991) ("Contracts are perfected by mere consent, and from that moment on the parties are bound not only with regard to the express agreement but also with regard to all the consequences which, according to their character, are in accordance with good faith, use and law.").

Second, Feliciano contends that the court lacks jurisdiction to enforce the CSA. Docket No. 189 at 20. But because this court retained jurisdiction to enforce the settlement agreement upon the parties' agreement to do so, and because the CSA incorporated the three agreements from 2005, the court has ample authority to enforce the terms of the CSA and issue an injunction despite the dismissal of Pina's claims against Feliciano. *See* Docket

No. 95; *Metro-Goldwyn Mayer, Inc. v. 007 Safety Products, Inc.*, 183 F.3d 10, 14 (1st Cir. 1999) ("The district court retains the power to enforce the settlement agreement provided the dismissal order expressly incorporates the settlement agreement, or expressly preserves jurisdiction over the settlement agreement.") (citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 378 (1994)).

Third, Feliciano claims that he is being deprived of property, in violation of the Fifth Amendment's Takings Clause, and that he is being forced into involuntary servitude, in violation of the U.S. and Puerto Rico Constitutions. Docket No. 189 at 20. Because Pina is not a government actor, there is no state action and therefore Feliciano's Takings Clause argument lacks merit. *See, e.g.*, *Story v. Green*, 978 F.2d 60, 62 (2d Cir. 1992) ("To state a claim . . . the Takings Clause, plaintiffs were required to allege facts showing that state action deprived them of a protected property interest."). Feliciano's other argument fares no better because, while he might breach his contractual obligations and incur monetary liability, he is free to leave the music industry and work in other respectable professions. *See, e.g.*, *Karrick v. Hannaman*, 168 U.S. 328, 336 (1897) ("court of equity cannot compel the performance of the service, although it may in some cases enforce a negative stipulation not to serve any third person within the time agreed"); *Garcia v. World Wide Entmt. Co.*, No. CE-92-126, 1992 WL 754802 (P.R. Dec. 24, 1992) ("while it is not possible to compel a person to do work under a personal service contract, it is possible to bar said person from rendering his services elsewhere during the duration of the contract."). Thus, the court should deny Feliciano's motion to set aside the preliminary injunction.

## II.   Permanent Injunction

Before a court may grant permanent injunctive relief, "[a] plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent

injunction." *Animal Welfare Inst. v. Martin*, 623 F.3d 19, 26 (1st Cir. 2010) (quoting *Monsanto v. Geertson Seed Farms*, 561 U.S. 139, 156–57 (2010)); *see also eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). In *The Shell Co. (P.R.) Ltd. v. Los Frailes Serv. Station, Inc.*, 605 F.3d 10, 19 (1st Cir. 2010), the First Circuit affirmed the district court's conversion of a preliminary injunction to a permanent injunction when the trial court did so "only after issuing a show cause order to [the defendant], and only after determining that [the defendant] had not advanced any new evidence or legal arguments beyond what it had presented at the preliminary injunction hearing." 605 F.3d at 19 n.4.

In this case, the court issued a preliminary injunction in March 2016. Docket No. 185. Afterward, the court ordered Feliciano to show cause for not converting the preliminary injunction into a permanent injunction. Docket No. 186. Importantly, Feliciano's response to the court's show-cause order does not suggest that he has delivered 100 master recordings or that five years have elapsed since the CSA was executed. Docket No. 189. What is more, Pina proffers evidence showing that Feliciano has continued to manage his own artistic career without including Pina. Docket Nos. 216-1–216-2. And, in his response to the show-cause order, Feliciano does not deny this; rather, he has expressly "admitted that he has performed by his own under the certainty that once the Judgment is satisfied he can manage his artistic career." Docket No. 189 at 21.

In light of the above, Feliciano has effectively decided to take it upon himself to decide what is or is not permitted by the CSA and the preliminary injunction issued to enforce compliance with that agreement, and "an evidentiary hearing would . . . serve[] little purpose" in determining whether a permanent injunction should issue. *See The Shell Co.*, 605 F.3d at 19n.4 ("an evidentiary hearing would have served little purpose, and the district court's conversion" of a preliminary injunction into a permanent injunction "was not error"); *see also McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 192 (1949) (contemnors effectively "undertook to make their own determination of what the decree meant" and "acted at their peril" when they did so). Accordingly, because Feliciano does

not proffer new evidence that would suggest a change in circumstances since the preliminary injunction issued, and because his legal arguments are largely the same as the ones decided at the preliminary injunction stage, the court should convert the preliminary injunction into a permanent injunction.

To be sure, a permanent injunction would be warranted even if the court assessed each of the equitable factors that courts consider when deciding whether to issue a permanent injunction. *See Martin*, 623 F.3d at 26. Pina has demonstrated that he has suffered irreparable harm and that there is no adequate remedy at law by showing that Feliciano has been freely doing business in violation of the Exclusive Booking Agreement and that, in doing so, Feliciano has missed events scheduled by Pina. *See* Docket Nos. 176 at 9–10, 185; *Simons of Warwick, Inc. v. Baccarat, Inc.*, 217 F.3d 8, 13–14 (1st Cir. 2000) ("because injuries to goodwill and reputation are not easily quantifiable, courts find this type of harm irreparable."); *Garcia*, 132 D.P.R. at 390 (if an artist "can freely do business with other promoters notwithstanding [his] exclusive contract [with a promoter], [then the promoter's] credibility and goodwill will be seriously affected in the entertainment industry, harming not only the [artist] but other lucrative business opportunities with other artists."). Therefore, the first two factors tip in Pina's favor.

The balance-of-hardships inquiry, which requires the court to balance "the hardship that will befall the nonmovant if the injunction issues . . . with the hardship that will befall the movant if the injunction does not issue," also tips in Pina's favor. *Mercado-Salinas v. Bart Enterprises Intern., Ltd.*, 671 F.3d 12, 19 (1st Cir. 2011). Pina entered into a settlement agreement with Feliciano to stop the conduct in which he is now engaging. If the permanent injunction does not issue, Pina will be deprived of benefitting from the settlement agreement the parties reached. And Feliciano may continue to damage Pina's goodwill with event promoters and event organizers in the absence of an injunction. If the permanent injunction issues, on the other hand, Feliciano will suffer some hardship by not being able to contract for his musical endeavors, either on his own or with the help of third parties.

Yet, this hardship is ameliorated somewhat because the CSA and the agreements incorporate therein are not indefinite, as Feliciano seems to suggest, and because Feliciano agreed to be bound by the CSA and the agreements incorporated therein. Thus, the court should find that the balance of hardships tips in Pina's favor.

The fourth factor, the public interest, also weighs in favor of Pina. Issuing a permanent injunction in this case would give full force and effect to the exclusivity contracts incorporated into the CSA. The "public interest would not be disserved by" issuing such an order, *see eBay*, 547 U.S. at 391, because the Puerto Rico Supreme Court has expressly found "important" to the "public interest" that—if exclusivity contracts are not enforced—"local and foreign promoters will not want to risk having exclusive contracts with other talent-ed [sic] youths in the fear that these exclusive contracts are not binding." *See Garcia*, 132 D.P.R. at 380. The Puerto Rico Supreme Court added that failing to enforce such exclusivity contracts might "hinder the possible development of Puerto Rico youths in show business, and would harm the local entertainment industry in general." *Id.* Thus, because each of the four equitable factors weigh in Pina's favor, the court should convert the preliminary injunction into a permanent injunction.

## CONCLUSION

For the foregoing reasons, the court should **DENY** Feliciano's motion to set aside the preliminary injunction, and should **GRANT** permanent injunctive relief.

This report and recommendation is filed pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(d) of the Local Rules of this Court. Any objections to the same must be specific and must be filed with the Clerk of Court **within fourteen days** of its receipt. Failure to file timely and specific objections to the report and recommendation is a waiver of the right to appellate review. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Davet v. Maccorone*, 973 F.2d 22, 30–31 (1st Cir. 1992); *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985, 991 (1st Cir. 1988); *Borden v. Sec'y of Health & Human Servs.*, 836 F.2d 4, 6 (1st Cir. 1987).

**IT IS SO RECOMMENDED.**

In San Juan, Puerto Rico, this 15th day of February 2017.

                                           *S/ Bruce J. McGiverin*
                                           BRUCE J. MCGIVERIN
                                           United States Magistrate Judge